# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
NOBLE COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

PAMELA S. REED,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 NO 0529

---

Criminal Appeal from the
Court of Common Pleas of Noble County, Ohio
Case Nos. 224-2003, 225-2002

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jordan C. Croucher,* Noble County Prosecutor, for Plaintiff-Appellee and

*Atty. R. Aaron Miller,* for Defendant-Appellant.

Dated: March 27, 2026

**DICKEY, J.**

{¶1} Appellant, Pamela S. Reed, appeals the August 29, 2025 journal entry of the Noble County Court of Common Pleas overruling her pre-sentence motion to withdraw her no contest pleas to two counts of child endangerment (M-1) (Case No. 224-2003), and her pleas made pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), to one count of telecommunications fraud (F-3) and two counts of forgery (F-5) (Case No. 225-2002). Appellant advances a single assignment of error alleging she received ineffective assistance of counsel at the hearing on the motion to withdraw pleas. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} Appellant has two children, A.R. (d.o.b. 2/18/2016) and Al.R. (d.o.b. 8/23/2013), who are relevant to this appeal. In 2017, A.R. was diagnosed with thrombocytopenia. Following two bone marrow biopsies, A.R. was diagnosed and underwent treatment for Aplastic Anemia and Myelodysplastic Syndrome ("MDS"). Left untreated, MDS can progress to Acute Myeloid Leukemia ("AML"), a type of cancer.

{¶3} A.R.'s treatment included one round of chemotherapy to destroy the abnormal cells then a bone marrow transplant in June of 2018. A.R. suffers ongoing, serious medical problems as a consequence of her illness and treatment, including acute kidney injury, adrenal insufficiency, chorioretinitis, right eye exotropia, neuroretinitis, and toxoplasmosis choriorinitis, which are common complications following treatment for MDS. A.R. was never diagnosed with AML, or any other type of cancer, never underwent radiation therapy, and never lost her hair due to the side-effects of chemotherapy.

{¶4} On January 22, 2024, Appellant was charged in a twelve-count indictment in Case No. 224-2003, which alleged she unlawfully accepted over $70,000 in donations from January 1, 2018 to January 8, 2024, to defray the cost of cancer treatment for A.R. Based upon Appellant's solicitation of funds from cancer organizations, her misrepresentations to teachers and administrators at A.R.'s school (which included at least one forged medical document), and Appellant's Facebook posts, Appellant was charged with one count of telecommunications fraud in violation of R.C. 2913.05(A), a felony of the third degree; two counts of endangering children in violation of R.C.

2919.22(A), felonies of the third degree; one count of grand theft in violation of R.C. 2913.02(A)(3), a felony of the fourth degree; and eight counts of forgery in violation of R.C. 2913.31(A)(1), felonies of the fifth degree.

{¶5}  On January 13, 2025, roughly one year after the indictment was filed in Case. No. 224-2003, a bill of information was filed in Case No. 225-2002, charging Appellant with one count of telecommunications fraud (F-3) and two counts of forgery (F-5).  That same day, represented by Attorney Matthew C. Mollica, Appellant entered *Alford* pleas to all counts in the Bill of Particulars and pleas of no contest to two charges of child endangerment in Case No. 224-2003, which were amended from felonies of the third degree to misdemeanors of the first degree.

{¶6}  Appellant faced a maximum sentence of five years in prison based on the five counts to which she plead.  At the plea hearing, Attorney Mollica represented the plea was the product of lengthy discussions with Appellant and her pleas were predicated upon a jointly-recommended sentence of four years and eleven months in prison, potential restitution in the amount of $70,638.52, and a joint motion for judicial release to be filed after six months of good behavior during incarceration.  (1/13/24 Plea Hrg., p. 3).  The prosecutor clarified the state would not join in the motion for judicial release, but instead had agreed not to oppose judicial release. (*Id.* at p. 5). Later in the proceedings Attorney Mollica added, "we have no issue waiving any sort of appeals." (*Id.* at p. 5).

{¶7}  The prosecutor provided the following factual basis for the pleas:

> [O]n January 4, 2023, information was received from Shenandoah Elementary School regarding concerns of seven year old [A.R.], and specifically with [A.R.'s] mother, that being [Appellant], who had told the school and provided documentation that [A.R.] had been diagnosed with cancer. [Appellant] had also informed the school that [A.R.] was blind in her right eye and would be having a port implanted in the near future for cancer treatments.
>
> The school expressed concerns after they had conducted an eye exam on all students and found that [A.R.] was in fact not blind in either eye.

The school further stated that she had missed over 280 hours of school for the year and that was also a concern.

The school administrator contacted Nationwide Children's Hospital and confirmed that [A.R.] did not have cancer or leukemia and had never had cancer or leukemia. It was also confirmed via documentation that had been provided to the school by [Appellant], that the diagnosis was fraudulent. So, specifically in reference to that, this would be the basis for one of the forgery counts.

There was a document that had been submitted to the schools stating that [A.R.] had been diagnosed with [AML]. Contact was made with Nationwide. That diagnosis was not made. Further investigation into that document revealed that the document had been photo-shopped, for lack of a better word. There had been a white block pasted over it and [AML] was put in as the diagnosis. I think the detectives had determined that it was pretty accurate but the original basis for how it was determined to be fraudulent was that myeloid was misspelled.

During the course of the investigation, there was a review into [A.R.'s] health history. It appears that in 2018, [A.R.] had received one chemotherapy treatment and a bone marrow transplant at Nationwide Children's Hospital which was successful for a blood disorder. As a result of the bone marrow transplant, [A.R.] did develop a chronic kidney disease but was not – is not (inaudible).

She was also – or I guess a symptom of that was a high blood pressure which she was supposed to be medicated for and the records have documented her condition as stable.

[A.R.] had developed an infection in her right eye, was seen by an ophthalmologist. They noted that her visual acuity was excellent.

[Appellant] had reported to the neurology team that [A.R.] was having seizures. EEGs were performed but the results were within the normal limits. There was a medication that was still provided for that which was occasionally given to [A.R.]. I believe it's pronounced Lamotrigine.

Nationwide had documented, there were several times they had questioned [Appellant] about [A.R.'s] hair being short or shaved. It was documented during an appointment that [Appellant] had stated that [A.R.] had cut her hair herself and that [Appellant] then had to shave it. And there was another time where she had stated that [A.R.] had pulled her own hair out causing [Appellant] to have to then shave it. Another time Nationwide had referred [A.R.] to a dermatologist.

A further investigation into the case revealed that there were numerous posts put on Facebook and across the internet through GoFundMe and other websites, essentially having fundraisers, trying to raise awareness and trying to seek donations and collections for [A.R.] for her cancer treatments.

On January 8th, 2024, [Appellant] was interviewed. [Appellant], at first, reading the report here, said, "[Appellant] at first lied but then admitted that [A.R.] did not have cancer and she had posted those statements because she had liked the support she was given as a result."

[Appellant] admitted that she had shaved [A.R.'s] hair and it was not because of cancer treatments. That she had obtained seizure medications because of what she had told her doctors. Acknowledged that [A.R.] did not likely need the medication and the seizures she reported were more of staring sessions.

[Appellant] showed the medications she had in the home that were prescribed to [A.R.] [O]f significant concern as it relates to the child endangering charge for [A.R.] is that the high blood pressure medication

that was for the chronic kidney disease, the script was filled but the prescription bottle was full and had not been provided to [A.R.] as it was supposed to be.

The doctors at Nationwide also raised concerns about sporadic use of Lamotrigine if it is not necessary to treat seizures as it can cause significant side effects and harm if it's not given in regular doses and if it's not given for a diagnosed purpose.

There is another sibling of [A.R.] who was also living in the home which would be the basis of the second child endangering count. Trying to just address both of those right now. So, the basis of the child endangering as far as a misdemeanor would be concerned is the high blood pressure medication and the various statements that [A.R.] was sick with cancer, that [A.R.] was not going to live to see [Al.R.'s] wedding.

After the kids had gotten into counseling [, Al.R.], which would be the basis, again, of the other child endangerment count, was diagnosed with post-traumatic stress disorder as a result of the events that have occurred here.

A deep dive and a thorough investigation by the sheriff's office revealed that this fraudulent [AML] document had also been sent to various other organizations which would include the Feel Better Foundation, Noble Local Schools, Steps Against Cancer, a donation organization that had a box set up at Chapman's, Shadow Harper, Brianna Bettinger, Kaitlyn Reed, BRAVA, Friends of Faith, and Friends of Faith Pruden, which would be the basis for the other forgery count to have those organizations.

As far as the telecommunications part is concerned, the State would submit to the court that on or about January 1st, 2018 through January 8th, 2024, here in Noble County, that [Appellant] had devised a scheme to defraud and did knowingly disseminate, transmit, or cause to be

disseminated or transmitted by means of telecommunications, writings, data, pictures, and images, and postings with the purpose to execute or otherwise further the scheme to defraud and the violation occurred as part of a course of conduct involving other violations of Division A of this section, which would include theft.

The basis for that would be the holding out that [A.R.] had cancer, that they were seeking donations for these cancer treatments.

The Sheriff's Office attempted to identify as many people as they possibly could that had made donations that could be documented. That would include Angel Works, Batesville United Methodist Church, a bake sale fundraiser organized by Hope Sayre, Bi-Con, BRAVA, Brianna Bettinger, the Caldwell United Methodist Church, Katie LaFollette, a donation organization run by Peggy Zirkle to raise money at Chapman's, Crooked Halo Photography, which would be Jamie Geese, the Duke and Duchess Station, Esther's Circle, which would be the Salesville Church of Faith, the Faith Baptist Church, Feel Better Foundation, Food Center, Friends of Faith Pruden, GoFundMe, a hog roast fundraiser organized by Caitlyn Reed, Heather Palmer, Mike Shot through St. Stephen's Catholic Church, the Noble County Health Department, the Salesville Church of Faith, Sammy and Julie Presnell, the State Farm Business run by Sue Snode, Stephanie Norman, a t-shirt fundraiser organized by Shadow Harper to raise funds, a t-shirt fundraiser organized by Shannon Baker to raise funds, Steps Against Cancer organized by Tammy Guy, Tiny Superheroes, and various other additional donations that have been made by identified parties but if we went through all those it would take quite some time. Total amount that have been able to be documented as donated based upon seeing these posts stating that she had cancer, that's what the purpose of the donations were for, was in the amount of $70,638.52.

As for the basis of the forgeries, in addition to the facts submitted to the court, the State would submit that over the same course and period of time, that being January 1st, 2018 through January of 2024, that [Appellant] here in Noble County, with the purpose to defraud and knowing that she was facilitating a fraud, did forge a writing, that being a medical document of Nationwide Children's Hospital, without the authority of Nationwide Children's Hospital in violation of the Revised Code.

And then, with regard to the child endangering, again, over the same course of time, January 1st, 2018 through January 8th, 2024, here in Noble County, that [Appellant] was a parent, guardian, or custodian of a person having custody, control of a person of loco parentis of a child under the age of 18, that would be [A.R.] and [Al.R.], and did create a substantial risk to the health or safety of those children by violating a duty of care, protection or support.

As far as this is concerned, as far as the misdemeanor amendment, is that it did cause harm, physical harm, but not rising to the level of serious physical harm. I believe that's everything.

(*Id.* at p. 19-26).

**{¶8}** At the conclusion of the state's recitation of facts, the trial court asked Attorney Mollica, "[t]hen is that your understanding [of the facts]?" Attorney Mollica responded, "for the purposes of the plea we would stipulate to those facts. We will have some clarification of evidence at the sentencing hearing." Next, the trial court asked Appellant, "you were present in the courtroom. Those are the facts you're stipulating to, correct?" Appellant responded, "[y]es, ma'am." (*Id.* at p. 27).

**{¶9}** The trial court continued, "And have you understood the proceedings here today?" Appellant replied, "[y]es, ma'am." (*Id.* at p. 27-28).

**{¶10}** Prior to accepting Appellant's pleas, the trial court inquired, "I'm about to accept your pleas of no contest and your *Alford* pleas and make findings of guilt. Once I do that[,] it'll be difficult, if not impossible, for you to withdraw those pleas, plead not guilty

and proceed to trial on these matters. So I give everyone one last shot at this juncture. Do you wish for me to accept your pleas?"  Appellant responded, "[y]es, ma'am." (*Id.* at p. 28).

**{¶11}** The trial court accepted the no contest and *Alford* pleas and entered a finding of guilt on all counts. The matter was set for sentencing on April 9, 2025 at Appellant's request. A presentence investigation was ordered.

**{¶12}** While awaiting sentencing, the trial court granted the motion of Attorney Mollica to withdraw, and Appellant retained Attorney Brian Benbow. The trial court instructed Attorney Mollica to provide all discovery to Attorney Benbow. The sentencing hearing was continued to July 1, 2025 to provide additional time for Attorney Benbow to review the evidence.  On June 27, 2025, Attorney Benbow filed a motion to continue the sentencing hearing for a second time, as he represented medical and financial information relevant to sentencing was still being gathered.  The sentencing hearing was rescheduled for July 22, 2025.

**{¶13}** On July 21, 2025, Attorney Benbow filed a sentencing memorandum on behalf of Appellant, in which Appellant requested a sentence of community control, with mental health treatment and rehabilitation, despite the prior agreed sentence of four years and eleven months, with an unopposed request for judicial release after six months of incarceration.   Appellant writes she is "no longer in agreement with a prison sentence." (7/21/25 Sent. Mem., p. 1).

**{¶14}** Specifically, it reads, "[Appellant] takes responsibility for her actions. [Appellant] has genuine remorse. [Appellant] apologizes to the victims, this Court, and law enforcement." (*Id.* at p. 2). The memorandum continues, "[t]hese crimes step [sic] from two bad choices by [Appellant] that were simply wrong. [Appellant] takes responsibility.  [Appellant] admits that his [sic] actions were unlawful. [Appellant] has shown genuine remorse. . ." (*Id*). The memorandum never identifies the "two bad choices."

**{¶15}** Appellant further argues in the memorandum that "[s]ubstantial mitigation [ ] exists."  She asserts she will lose her job if she is incarcerated and will be separated from her children for an additional six months.  Appellant further asserts her charged

conduct is an outlier, as she has no criminal history or bond violations. Finally, Appellant reveals she suffers from diabetes. (*Id*. at p. 3).

**{¶16}** Appellant contends "[w]hat the media reported is far from the truth herein." (*Id*.). She asserts she was villainized by the media and has received death threats as a consequence of false reporting. In support of her request for community control, Appellant argues she has a sick child who needs Appellant.

**{¶17}** In addition, Appellant attached numerous medical records to the sentencing memorandum, as well as the expert report prepared by Dr. Ohly. According to Dr. Ohly, the relationship between MDS and AML could result in confusion with respect to A.R.'s diagnosis. However, Dr. Ohly's opinion stops far short of asserting Appellant's innocence and instead provides an excuse for her criminal behavior, despite the fact that he was retained for the sole purpose of reviewing A.R.'s medical records.

**{¶18}** The conclusion of his expert report reads:

> While [Appellant's] recent actions requiring intervention cannot be dismissed, they should be viewed within the broader context of her earlier dedication to [A.R.'s] care. The possibility of relapse, which carries a 40-50% probability in pediatric MDS cases post-successful BMT, creates an ongoing psychological burden that significantly impacts daily life. This case illustrates the importance of understanding and supporting parents who must operate under extraordinary levels of stress while managing complex chronic illness in their children.

(12/30/24 Ohly Rep., p. 10).

**{¶19}** Unpersuaded by Appellant's sentencing memorandum, the prosecutor argued in favor of the imposition of the maximum sentence of five years imprisonment at the sentencing hearing on July 22, 2025. First, the state challenged representations made in the sentencing memorandum that were unsupported by the record. The state argued Appellant had shown no remorse and had not apologized to anyone. Further, the argument that her "two mistakes" were an outlier was contravened by the fact that she

stipulated at the plea hearing to engaging in a fraudulent scheme spanning six years in which she collected over $70,000 in donations. (7/22/25 Sent. Hrg., p. 6-9).

**{¶20}** While the state conceded A.R. had ongoing serious health problems, he cited Facebook posts by Appellant, in which she represented A.R. had brain lesions, brain tumors, AML, and was participating in a medical trial in Michigan costing thousands of dollars. In two other Facebook posts, Appellant recounted the experience of twice shaving A.R.'s head following hair loss, which Appellant attributed to A.R.'s chemotherapy treatments. Finally, the state alleged Al.R. was told for years that A.R. was going to die.

**{¶21}** The state also cited documents falsified by Appellant in order to explain A.R.'s constant absence from school. For instance, in December of 2023, Appellant alleged A.R. had undergone radiation and a scan, the spots on her brain were growing, and she would have to undergo surgery on her head in the future.

**{¶22}** In another December 2023 communication with the school, Appellant wrote, "[A.R.'s] been diagnosed with hepatoblastoma. The leukemia (AML) is still stable but now this. So the aggressive treatment is coming." (*Id.* at p. 21). In December of 2023, Appellant also told the school A.R. did not want to attend because she was bullied as a consequence of her bald head.

**{¶23}** With respect to the sentencing factors, the state argued injury to the victims was exacerbated by their age and facilitated by their relationship with Appellant. Recidivism was likely given the scope and breadth of Appellant's conduct, as well as Appellant's failure to admit her crimes or express remorse. The state requested a 60-month prison sentence (as opposed to the 59-month prison sentence in the plea agreement) and restitution in the amount of $70,638.52. At the sentencing hearing, the state was silent regarding judicial release.

**{¶24}** The state concluded its roughly 30-minute argument in favor of the 60-month sentence as follows:

> To cloak this diagnosis, for the attention and financial gain, to put her children through what they suffered over this entire period of time of seven years, the state cannot believe there would be any sentence that would be appropriate other than the maximum sentence.

Case No. 25 NO 0529

(*Id.* at p. 27).

**{¶25}** Attorney Benbow stood and said:

> Well, I am now in an ethical dilemma, because based upon that, my client wishes to withdraw her plea and have a trial. And the problem I have is that, yeah, she came in here wanting to argue for community control today. The state, in return, asking for maximum, consecutive sentences, which to me is troubling.

(*Id.* at p. 30).

**{¶26}** After reviewing case law from our district, the trial court adjourned the sentencing hearing to facilitate briefing of the oral motion to withdraw pleas and to schedule a hearing on the same. Appellant filed a verified motion to withdraw pleas on August 12, 2025, which was accompanied by an affidavit asserting the truth of the matters in the motion.

**{¶27}** In Appellant's motion, she asserted four reasons to support her motion. First, Appellant argued withdrawing her plea would not result in prejudice to the state. She argued all of the donors remained subject to the trial court's subpoena powers. Second, Appellant argued the timing of the motion was reasonably timed, as it was asserted prior to the imposition of sentencing. Next, she argued the reason for the motion, her innocence, supported withdrawing her plea. Lastly, she argued perhaps she was innocent or had a complete defense.

**{¶28}** Appellant's claim of actual innocence was predicated upon the state's alleged failure to show causation. Appellant writes, "[r]egarding actual innocence, [Appellant] states that donations made would have been made anyway had the donors known the actual extent of the child's illness. The State take [sic] issue with the particular diagnosis without providing any evidence the donors would have refused to donate given the child's actual diagnosis." (8/12/25 Mot., p. 2).

**{¶29}** In her affidavit, Appellant averred A.R. is legally blind, A.R. was properly medicated by Appellant, and A.R. underwent five "rounds of chemo," clarifying that five different chemotherapy drugs were administered prior to her 2017 bone marrow

transplant. Appellant further averred there are lesions on A.R.'s brain, and one of the drugs prescribed for A.R. after the bone marrow transplant caused hair loss. A.R. was prescribed oral medication identified as chemotherapy on its packaging, and the money collected from the various fundraisers were used to pay for A.R.'s medication during a black-out period when the family's medical insurance was suspended due to a change in insurance companies by the employer of A.R.'s father. Appellant averred A.R. underwent two bone marrow transplants. Finally, Appellant averred any trauma suffered by A.R. and Al.R. was the result of the fire that destroyed the family's residence.

**{¶30}** On August 18, 2025, Appellant filed a "supplemental memorandum in support of her motion for new trial [sic]." Appellant attached correspondence dated April 14, 2025 to Attorney Benbow from the Parenting Coordinator/Intensive Outpatient Program Supervisor at Cedar Ridge Behavioral Health Solutions, where A.R. and Al.R. were undergoing counseling. The letter reads that both A.R. and Al.R. "are requesting time with their mother and have suffered with the mother being restricted of her parenting time." Relevant to the motion to withdraw pleas, the letter reads, "[b]oth [girls] are reporting trauma from being separated from their mother and a house fire that the family endured and do not disclose any traumatic symptoms associated with alleged fictitious medical events reportedly occurring in the case."

**{¶31}** The hearing on the motion to withdraw pleas was conducted on August 19, 2025. Appellant testified on her own behalf, and the state offered the testimony of Mark Smith, the Chief Probation Officer in Noble County.

**{¶32}** At the beginning of the hearing, the trial court observed Appellant's protestations of innocence throughout the proceedings were evidence that Appellant was "perhaps not guilty," citing *State v. Jones*, 2020-Ohio-3578, ¶ 25 (7th Dist.). In that case, we found Jones' desire to change her plea on the day following the plea hearing constituted sufficient evidence that she was "perhaps innocent." *Id.* at ¶ 25.

**{¶33}** Based on the minimal evidentiary threshold with respect to innocence ("perhaps"), the trial court observed Appellant was not required or expected to establish her innocence through her testimony at the hearing. Nonetheless, the majority of Appellant's testimony at the hearing was offered to establish her innocence, and directly contradicted many of the material facts to which she stipulated at the plea hearing.

{¶34} Citing the Cedar Ridge letter, Appellant asserted any trauma suffered by A.R. and Al.R. was attributable to the house fire. She further stated a portion of the funds raised through donations were provided because the fire had destroyed the family residence (2022-2023), with another large portion of the donated funds provided to defray the cost of the 2018 bone marrow transplant (2018-2020). (8/19/25 Mot. Hrg., p. 29).

{¶35} Appellant testified A.R. suffers from legal blindness in her *peripheral* vision as a result of toxoplasmosis. Although Appellant conceded A.R. was never diagnosed with cancer, Appellant testified A.R. is prescribed chemotherapy drugs. Appellant further testified A.R. cut her hair with a pair of scissors on one occasion, and a razor on another, both requiring Appellant to completely shave A.R.'s head.

{¶36} Appellant conceded she completed an online form for donations from BrAva, a nonprofit organization for a cure for childhood cancer, on which she identified A.R.'s diagnosis as "AML Leukemia." She explained she chose AML Leukemia because the drop-down menu on the website did not have an MDS (not cancer) option and AML Leukemia (cancer) was the closest match. In a text exchange with a BrAva representative, Appellant writes, "[w]e are still in need of $4900." (State's Exh. G-2).

{¶37} Finally, Appellant testified she entered her pleas "because [she] was told in the deal that [she] would get to see [her] kids." (Mot. Hrg*.*, p. 40). Appellant further testified she wants to go to trial to put additional medical records in evidence.

{¶38} On cross-examination, Appellant conceded A.R. was never diagnosed with cancer and never underwent radiation therapy. Appellant further conceded A.R. passed a vision test without corrective lenses at school, but alleged that her legal blindness classification was predicated upon her peripheral vision. Appellant explained she mistakenly reported a bone density test to the school as "total body radiation."

{¶39} The State introduced a Facebook post from Appellant dated September 21, 2020 reads,

> Tonight after her shower, [A.R.] said "mommy I don't want to comb my hair . . . because I combed it a little bit ago and a lot fell out!!! [emoji] . . . Why her!?! She just wants to be a little girl with long hair and all the hair accessories in the world . . . This childhood cancer . . . WE NEED A CURE."

. . . "[w]hen someone has CANCER . . . the whole FAMILY and everyone who loves them does too. Support Childhood Cancer Awareness."

(State's Exh. B).

**{¶40}** Appellant conceded she misstated A.R. underwent nineteen "rounds of chemo," alleging the correct number was nine "before the second transplant." (*Id.*, p. 49). The foregoing reference to a "second transplant" is the first and only reference in the record to a second transplant. Appellant explained she meant "types" of chemotherapy drugs but inadvertently stated "rounds" of chemotherapy.

**{¶41}** Appellant testified:

[M]y daughter was a very sick little girl. It doesn't matter the diagnosis; she was very sick. She went through more things than some cancer patients will probably ever go through. It was terrible to watch, it was terrible to go through, and we did it.

(*Id.*, p. 153).

**{¶42}** Appellant conceded she had done something "wrong," but averred she would "never hurt [her] children." (*Id.*, p. 52). She asserted the state misrepresented the facts of the case – alleging A.R. was a healthy child – in order to incense donors. (*Id.*, p. 53).

**{¶43}** Appellant characterized the telecommunications charge as "a little harsh." (*Id.*, p. 53). Appellant described her defense to the telecommunications fraud charge as follows:

That you're basically saying that I was on Facebook begging for people to give me money and most of my Facebook posts were merely prayers, asking for prayers and things like that. I never one time got on Facebook or any social media site and begged people to hand me money.

(*Id.* at p. 55-56).

{¶44} At the conclusion of cross-examination, Appellant conceded she was present at the plea hearing and she stipulated to the facts articulated by the prosecutor. On redirect, Appellant testified the $4,900 donation from BrAva was used to defray the cost of A.R.'s medical treatment. Nonetheless, the trial court opined at the hearing that Appellant had admitted that she knowingly forged and submitted the BrAva online form to solicit donations. (*Id.* at p. 63).

{¶45} Probation Officer Smith testified Appellant told him on February 26, 2025 that her information had not been presented correctly at the plea hearing and that she wanted community control, rather than a near-maximum sentence with an unopposed motion for judicial release after six-months of incarceration. Smith further testified Appellant represented on March 12, 2025 that she intended to withdraw pleas in order to try the case to the bench. The state offered Smith's testimony to show Appellant had planned to withdraw pleas for months prior to the July 22, 2025 sentencing hearing, and as evidence that the timing of the motion was unreasonable.

{¶46} In her closing argument, Appellant challenged Attorney Mollica's representation. She predicated her claim of ineffectiveness on a pending, unrelated disciplinary matter against him before the Ohio Supreme Court and the fact that she fired him and retained Attorney Benbow after entering her pleas.

{¶47} Nonetheless, Appellant conceded the plea hearing was thorough and she understood the nature of the charges against her. Attorney Benbow argued the matter "absolutely positively needs to be tried," because if it was a civil matter, there would be genuine issues of material fact regarding Appellant's innocence. (*Id.* at p. 90-91). Appellant further alleged restitution was entirely speculative because donors would have likely offered financial support if they were informed of A.R.'s actual diagnosis.

{¶48} The state countered that the seven months that elapsed between the plea hearing and the motion to withdraw pleas was unreasonable. The state likewise challenged Appellant's reason for withdrawing the pleas, as her allegation that she entered it solely for the purpose of seeing her children was belied by the record because the trial court confirmed the no contact order would continue until therapists treating A.R. and AI.R. concluded contact with Appellant would not harm them, and thereafter the court would conduct a hearing on the issue. Next, the state argued Appellant had confessed

Case No. 25 NO 0529

guilt to the forgery counts at the hearing, and her argument that she would have received donations from cancer specific organizations despite her misrepresentation of A.R.'s diagnosis was both speculative and unworthy of credence.

{¶49} The trial court overruled the motion to withdraw the pleas at the conclusion of the hearing. The trial court concluded the state would be prejudiced by the withdrawal of pleas, as the charges had been pending against Appellant for two and a half years. The trial court further concluded Appellant had offered no evidence to support her bald assertion that Attorney Mollica's representation was deficient. The trial court cited Attorney Mollica's pre-trial motions, including the motion for the appointment of Dr. Ohly, and his representation at several pre-trial hearings, as evidence that he provided effective assistance. Next, the trial court found the plea hearing was adequate, as Appellant received all the required notices during her plea colloquy, and Appellant represented at the plea hearing that she understood the charges against her.

{¶50} The trial court concluded the timing of the motion was unreasonable as seven months had elapsed between the plea and Appellant's oral motion to withdraw pleas at the sentencing hearing. Moreover, the trial court found the circumstances surrounding Appellant's oral motion to withdraw pleas to be "a little suspect," given Appellant first announced her desire to withdraw her pleas after the state argued in favor of the maximum sentence. Although Appellant's no contest and *Alford* pleas were evidence that she was perhaps innocent, the trial court found Appellant's admissions at the hearing on the motion to withdraw pleas showed she did not have a complete defense to the charges. The fifth and sixth factors, which relate to the extent of the hearing on the motion to withdraw pleas and the full consideration of the arguments advanced, was not addressed by the trial court as they are to be determined by a reviewing court.

{¶51} After overruling the motion, the trial court imposed 90-day sentences for each of the child endangerment convictions in Case No. 224-2003, to be served concurrently with each other and the felony sentences. The trial court imposed a sentence of thirty-six months of imprisonment for the telecommunications fraud conviction, and twelve months for each forgery conviction in Case No. 225-2002. The forgery sentences were imposed to run concurrently but consecutively with the

telecommunications fraud sentence. The trial court memorialized its decision overruling the motion to withdraw pleas in an August 29, 2025 journal entry.

{¶52} After this timely appeal was filed, the state filed a motion to dismiss in which the state asserted Appellant waived her appellate rights at the change of plea hearing. However, we concluded Appellant's waiver of her appellate rights was neither knowing nor voluntary based on the verbal exchange between Appellant and the trial court, wherein the trial court asked Appellant whether she understood the effect of her waiver of appellate rights, and Appellant responded, "[t]hat I can't take it back." We further predicated our conclusion that the waiver of appellate rights was invalid on the parties' post-plea modification of a material element of the plea agreement (the jointly-agreed sentence), which called into question the enforceability of the other terms in the plea agreement.

{¶53} Appellant filed a timely appeal and raises one assignment of error.

## ASSIGNMENT OF ERROR

**THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE HEARING ON THE MOTION TO WITHDRAW THE PLEA HEARING ON AUGUST 19, 2025.**

{¶54} In her sole assignment of error, Appellant argues she was denied the effective assistance of counsel at the hearing on the motion to withdraw pleas. Specifically, Appellant argues but for Attorney Benbow's deficiencies, the trial court would have permitted her to withdraw her no contest and *Alford* pleas.

{¶55} A plea of no contest is not an admission of defendant's guilt, but an admission of the truth of the facts alleged in the indictment, information, or complaint, and such plea or admission cannot be used against the defendant in any subsequent civil or criminal proceedings. Crim.R. 11(B)(2). In *Alford,* the United States Supreme Court held a plea with a protestation of innocence can be upheld where the "defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." *Id.* at 37.

{¶56} The *Alford* Court added:

When [Alford's] plea is viewed in light of the evidence against him, which substantially negated his claim of innocence and which further provided a means by which the judge could test whether the plea was being intelligently entered . . . its validity cannot be seriously questioned. In view of the strong factual basis for the plea demonstrated by the State and Alford's clearly expressed desire to enter it despite his professed belief in his innocence, we hold that the trial judge did not commit constitutional error in accepting it.

*Id.* at 37-38; *see also State v. Post*, 32 Ohio St.3d 380, 387 (1987) ("no constitutional error was found in accepting a guilty plea which contained a protestation of innocence, if the defendant intelligently concludes that his interests require entry of a guilty plea and if the record before the court contains strong evidence of guilt").

{¶57} In *State v. Diehl*, 2017-Ohio-7708 (7th Dist.), we acknowledged "an *Alford* plea is a species of a guilty plea." *Id.* at ¶ 19, citing *State v. Griggs*, 2004-Ohio-4415, ¶ 13, and further distinguished no contest pleas and *Alford* pleas as follows:

We agree *Alford* pleas are used to limit liability; an *Alford* plea is usually entered as part of a plea deal to a lesser crime to limit incarceration time. However, a no contest plea also may be entered as part of a plea agreement under the same circumstances. Furthermore, a no contest plea cannot be used against an offender in a civil action, whereas, a guilty plea may be used in a civil suit against an offender.

*Diehl* at ¶ 20.

{¶58} We have previously recognized the requirements for a valid plea colloquy are heightened where a plea is accepted pursuant to *Alford*. The trial court must inquire into the factual basis surrounding the charges to determine whether the defendant is making an intelligent and voluntary guilty plea. *State v. Redmond*, 2018-Ohio-2778, ¶ 11 (7th Dist.). The trial court may accept the guilty plea only if a factual basis for the guilty plea is evidenced by the record. *See, e.g.*, *State v. Corbett*, 2013-Ohio-4478, ¶ 6 (8th Dist.) ("When taking an *Alford* plea, the trial court cannot determine whether the accused

was making an intelligent and voluntary guilty plea absent some basic facts surrounding the charge demonstrating that the plea cannot seriously be questioned.").

{¶59} Pursuant to Crim.R. 32.1, a defendant may move to withdraw her guilty pleas before her sentences are imposed. Motions to withdraw a guilty plea before sentencing "should be freely and liberally granted." *State v. Xie*, 62 Ohio St.3d 521, 527 (1992). Nonetheless, "[a] defendant does not have an absolute right to withdraw a guilty plea prior to sentencing." *Id.* at paragraph one of the syllabus. There must be a "reasonable and legitimate basis" for the withdrawal of the plea. *Id.*

{¶60} When an appellant asserts a substantive challenge to the trial court's decision overruling a pre-trial motion to withdraw plea, we look to nine factors ("*Fish* factors") to determine whether the trial court abused its discretion:

> (1) whether the state will be prejudiced by withdrawal; (2) the representation afforded to the defendant by counsel; (3) the extent of the Crim.R. 11 plea hearing; (4) whether the defendant understood the nature of the charges and potential sentences; (5) the extent of the hearing on the motion to withdraw; (6) whether the trial court gave full and fair consideration to the motion; (7) whether the timing of the motion was reasonable; (8) the reasons for the motion; and (9) whether the accused was perhaps not guilty or had a complete defense to the charge.

*State v. Scott*, 2008-Ohio-5043 at ¶ 13 (7th Dist.), citing *State v. Fish*, 104 Ohio App.3d 236, 240 (1st Dist. 1995). While no one factor is conclusive for the determination of whether the trial court should have granted the motion to withdraw, *State v. Morris*, 2014-Ohio-882, ¶ 22 (7th Dist.), we have observed the no-prejudice-to-the-state factor is one of the most important factors. *State v. Cuthbertson*, 2000-Ohio-2638 (7th Dist.).

{¶61} Here, however, Appellant does not allege an abuse of discretion by the trial court, but instead contends her defense counsel provided ineffective assistance at the hearing on the motion to withdraw pleas. To prevail on an ineffective assistance of counsel claim, Appellant must demonstrate both that defense counsel's representation fell below an objective standard of reasonableness and that defense counsel's deficient

performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).

**{¶62}** To establish deficient performance, Appellant must show defense counsel made errors so serious that he was not functioning as the attorney guaranteed by the Sixth Amendment. *Id.* To show prejudice, a defendant must prove defense counsel's errors were so serious that there is a reasonable probability the result of the proceedings would have been different. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding fundamentally unfair due to the performance of trial counsel. *Id.,* citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). The failure to establish deficient performance or prejudice ends the inquiry.

**{¶63}** Licensed attorneys in Ohio are presumed competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289 (1999). In evaluating trial counsel's performance, appellate review is highly deferential because of the strong presumption defense counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland* at 689. In fact, appellate courts are prohibited from second-guessing defense counsel's strategic decisions. *Carter* at 558.

**{¶64}** In her appellate brief, Appellant broadly asserts "[Attorney Benbow's] failure to address nearly every factor to be considered by the trial court pursuant to *Xie*, was deficient and therefore satisfies the first prong of *Strickland*." (Appellant's Brf., p. 8). To the contrary, Attorney Benbow addressed each of the *Fish* factors individually both in the verified motion to withdraw pleas and at the hearing on the motion. (8/12/25 Motion, p. 7-12).

**{¶65}** Attorney Benbow conceded Attorney Mollica provided effective assistance of counsel and Appellant was given a full and fair Criminal Rule 11 hearing, including proper notice of the charges and potential penalties. However, he argued at length lack of prejudice to the state, the timing of the motion to withdraw pleas, the reasons for the motion, and that Appellant was perhaps innocent or had a complete defense favored the motion to withdraw pleas.

{¶66} In Appellant's analysis, she focuses her deficient representation claim on three of the *Fish* factors, prejudice to the state, her lack of understanding of her appellate rights, and that she is perhaps not guilty.  Specifically, Appellant writes:

> While the motion to withdraw plea hearing was quite extensive, it is apparent from the record that counsel addressed the underlying facts of the case that would have been presented had a trial to the court or jury trial been conducted.  Counsel failed to address in detail what, if any, prejudice would occur to the state.  Counsel failed to address Appellant's lack of understanding of the right to appeal and the repercussions of Appellant's statement regarding waiver of appellate right and the Appellant's apparent misunderstanding of that right. Counsel failed to address the issue of original counsel being ineffective during the Crim.R. 11 plea hearing for not ensuring that the Appellant understood the statutorily-provided appellate right. Counsel failed to clearly set forth reasons for the motion. Instead, counsel set forth evidence that would have been presented at trial.  Finally, counsel did not argue that Appellant was not guilty of any of the charges.

(*Id*. at p. 7-8).

{¶67} Appellant's first and third arguments are easily dismissed.  In her first argument, Appellant contends Attorney Benbow failed to address the lack of prejudice to the state "in detail."  Attorney Benbow argued the state suffered no prejudice because all of the witnesses were still subject to the trial court's subpoena power.

{¶68} Although Appellant asserts the foregoing argument constitutes deficient performance, she has not offered any additional argument regarding prejudice to the state in her appellate brief. Appellant's only assertion that is even arguably distinct from Attorney Benbow's arguments at the hearing is the state would suffer no prejudice because she "does not believe that any of the state's evidence was lost or any witness not being available for trial [sic]."  (*Id*. at p. 8).  However, Attorney Benbow advanced essentially the same argument when he asserted all of the witnesses remained subject to the trial court's subpoena power.

Case No. 25 NO 0529

**{¶69}** In her third argument, Appellant contends Attorney Benbow's representation was deficient based on Appellant's waiver of her appellate rights. Even assuming arguendo Attorney Benbow's representation was deficient as it relates to her waiver of appellate rights, Appellant must also show she suffered prejudice. Because we overruled the state's motion to dismiss this appeal, Appellant suffered no prejudice as a result of the waiver of her appellate rights.

**{¶70}** In Appellant's second argument, she challenges Attorney Benbow's efforts to satisfy the final *Fish* factor, that is, she is "perhaps not guilty of or had a complete defense to the charges." Based on the trial court's acknowledgement at the hearing that Appellant had satisfied the ninth *Fish* factor by seeking to withdraw her pleas, she argues Attorney Benbow should not have offered her testimony at the hearing.

**{¶71}** Appellant's testimony at the hearing was offered to contradict the stipulated evidence at the plea hearing. Appellant offered exculpatory evidence, that is, A.R.'s diagnoses were easily confused with AML and A.R. continued to receive oral chemotherapy drugs after the bone marrow transplant. Her testimony also established the severity of A.R.'s illness, which supported her argument that donors would have contributed money to defray the cost of A.R.'s medical expenses regardless of her actual diagnosis.

**{¶72}** To the extent Appellant's testimony was interpreted by the trial court to prove her guilt on certain charges, we do not find the error was so serious that Attorney Benbow "was not functioning as the attorney guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687-688. Attorney Benbow's decision to offer Appellant's testimony at the hearing was a strategic decision, which we are not permitted to second-guess. *Carter*, 72 Ohio St.3d at 558.

**{¶73}** The trial court opined all of the *Fish* factors favored the state. The trial court found Appellant's charges had been pending for two and a half years, and seven months between the entry of her pleas and her motion to withdraw pleas. Moreover, the trial court found the circumstances surrounding Appellant's oral motion to withdraw her pleas to be "a little suspect," given Appellant first announced her desire to withdraw her plea after the state argued in favor of the maximum sentence. The trial court further concluded Attorney Mollica provided effective assistance of counsel at the plea hearing, the plea hearing was

thorough, and Appellant admitted she understood the charges and the potential sentences. Although Appellant's no contest and *Alford* pleas were evidence that she was perhaps innocent, the trial court found Appellant's admissions at the hearing on the motion to withdraw pleas showed she did not have a complete defense to the charges. Finally, we find the hearing on the motion to withdraw pleas was extensive and the trial court afforded full consideration to Appellant's arguments and testimony. When Appellant made her oral motion to withdraw her pleas at the sentencing hearing, the trial court paused to review the relevant case law, then granted leave to Appellant to file a written motion to withdraw pleas and set the matter for an evidentiary hearing. After a lengthy evidentiary hearing, the trial court addressed each of the *Fish* factors before overruling the motion to withdraw pleas.

**{¶74}** Even assuming arguendo Attorney Benbow provided deficient representation when he offered Appellant's testimony at the hearing, Appellant cannot establish prejudice. The trial court concluded all of the *Fish* factors favored the state. We cannot conclude Attorney Benbow restricting Appellant's testimony at the hearing would have prompted a different result.

**{¶75}** Given the deference that we must afford to Attorney Benbow's representation, based on the strong presumption that legal counsel's conduct fell within the wide range of reasonable professional assistance, and the absence of prejudice in the record, we find Appellant has failed to establish either prong of the *Strickland* standard. We further find Appellant's sole assignment of error has no merit.

## CONCLUSION

**{¶76}** For the foregoing reasons, the August 29, 2025 journal entry overruling Appellant's pre-sentence motion to withdraw pleas is affirmed.

Robb, J., concurs.

Hanni, J., concurs.

Case No. 25 NO 0529

———————————

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Noble County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**